Steven C. Dawson, Bar No. 006674
Anita Rosenthal, Bar No. 006199
Aaron Dawson, Bar No. 034951
Sander R. Dawson, Bar No. 032243
DAWSON & ROSENTHAL, P.C.
25 Schnebly Hill Road
Sedona, Arizona   86336-4233
Telephone: (928) 282-3111
Facsimile: (928) 282-3126
dandr@dawsonandrosenthal.com

David S. Shughart, Bar No. 015299
Beale, Micheaels, Slack & Shughart, P.C.
7012 North 18th Street
Phoenix, Arizona 85020
Telephone: (602) 285-1444
Facsimile: (602) 285-1516
dshughart@bmsslaw.com

*Attorneys for Plaintiff Justin Fontaine*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Justin W. Fontaine, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>National Health Insurance Company, a Texas corporation; National General Holdings Corporation, a Delaware corporation; LIFE Association, Inc., a Texas nonprofit corporation; Joseph C. Holm, an individual; and Health Insurance Advocates LLC, an Arizona Limited Liability Company,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND JURY REQUEST** |

Plaintiff, Justin W. Fontaine (hereinafter "Fontaine" or "Plaintiff"), through undersigned counsel, hereby files his Complaint and alleges as follows:

## INTRODUCTION

1)      Defendants have concocted an elaborate scheme to evade consumer protection laws for insureds in Arizona and other states in order to maximize sales of Short-Term, Limited Duration Insurance policies ("Short-Term Policies" or "STLD") and to maximize denials and rescissions of these policies in the event of large claims. Short-Term Policies are not subject to the federal statutory consumer protections of the Affordable Care Act ("ACA"), but exist in a state regulatory framework except for their permitted maximum duration and certain mandatory disclosures set by the federal government.

### *The Risks of Short-Term Policies*

2)      STLD policies are not subject to the ACA's consumer protections, including minimum benefit standards, the prohibition against denying or rescinding coverage for pre-existing medical conditions, guaranteed renewability, and the requirement that the insurer expend a minimum amount of premium dollars on medical care.

3)      Historically, Short-Term policies have been purchased to fill a temporary gap in coverage, as when someone is in-between jobs. As of October 2016, STLD policies were not permitted to exceed policy durations of more than three months without renewal. This rule was implemented by several federal agencies due to the concern that STLD policies were being sold as a replacement for major medical coverage, rather than for filling short-term gaps in more comprehensive coverage.

4)      By federal rule, as of August 2018, the three-month duration limitation for STLD policies ended, allowing STLD policies to be offered for durations up to 364 days, with renewal options permitted for a total coverage period of up to three years.

5)      A typical STLD policy will offer lower premiums than ACA-compliant plans, but insureds purchasing STLD policies assume much greater risk of paying

considerably more out of pocket for a covered condition, for having no coverage for various medical conditions, and for being subjected to pre-existing condition denials and policy rescissions.

6) These policies and the companies that sell them have come under intense criticism and scrutiny from consumer advocates. Even the United States Congress became involved, with the U.S. House of Representatives Energy and Commerce Committee, Subcommittee on Health's investigation and June 2020 report, which concluded that Short-Term Policies "present a significant threat to the financial health and well-being of American families. [Short-Term] plans include limited protection for both catastrophic medical costs and routine medical care, and it is unclear what kind of value consumers are getting for their premium dollars, other than a false sense of security." *See* "Shortchanged: How the Trump Administration's Expansion of Junk Short-Term Health Insurance Plans is Putting Americans at Risk" ("Shortchanged"), at https://energycommerce.house.gov/newsroom/press-releases/ec-investigation-finds-millions-of-americans-enrolled-in-junk-health.

7) Defendants' scheme to evade state regulation and forum shop for the most insurer-friendly state law by issuing Short-Term Policies through out-of-state associations has allowed Defendants to price their products well below those offered on the ACA's exchanges. These low price points for Short-Term Policies, combined with deceptive tactics used by insurers, draw consumers away from the ACA's comprehensive benefits and consumer protections, including essential health benefits, low out-of-pocket maximums, and ban on denying coverage for people with pre-existing conditions.

8) Absent Defendants' elaborate, fraudulent scheme to maximize claim denials based on pre-existing conditions, to maximize policy rescissions based on purportedly undisclosed medical conditions, and to drive down premiums by evading state regulations that, among other things, require an insurer to spend a minimal percentage of premiums on medical care, many consumers, including Mr. Fontaine, would opt for the comprehensive coverage of Affordable Care Act policies.

**JURISDICTION AND VENUE**

9) This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962, 1964, and 28 U.S.C. §§ 1331 and 1367.

10) The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(a) because the Defendants reside, are found, have an agent, or transact their affairs in Arizona. Additionally, this Court has personal jurisdiction over the individual Defendant due to his domicile in Arizona, and over the corporate Defendants because they consented to service of process by registering with various agencies in the state of Arizona, including the Department of Insurance and the Arizona Corporation Commission.

11) Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C § 1391(b) because Defendants reside, are found, have an agent, or transact business in this District, and because a significant part of the events, acts, and omissions giving rise to this action occurred in this District.

**PARTIES**

12) Plaintiff Justin Fontaine is a resident of Maricopa County, Arizona. Mr. Fontaine and his then wife, now ex-wife, Kelly Fontaine, purchased a Short-Term Policy and an Accident Policy from Defendant National Health Insurance Company. The Short-Term Policy was sold as a group policy through Defendant LIFE Association on December 15, 2020, by Defendant National Health's licensed insurance agent Joseph Holm. On February 20, 2021, Fontaine was in a traffic accident and was run over by a large pickup truck, suffered serious injuries, and incurred hundreds of thousands of dollars of medical expenses. Defendants covered less than $100 of these expenses before rescinding Fontaine's policy on June 14, 2021.

13) Defendant National Health Insurance Company ("National Health") is incorporated and has its principal place of business in Texas. National Health offers health insurance products in nearly every state and offers Short-Term Policies as group insurance through LIFE Association in 19 states. These Short-Term Policies are not subject to the Affordable Care Act's consumer protections.

4

14)     Defendant National General Holdings Corporation ("National General") is incorporated in Delaware and has its principal place of business in New York. National General's wholly owned subsidiaries include 22 regulated domestic insurance companies, including National Health. National General also owns America's Health Care Plan, an insurance services company, Quotit Corporation, a software company specializing in insurance services, Velapoint, LLC, a marketing agency, and National General Management Corporation, an insurance services company. National General uses the trade name National General Accident and Health for various subsidiaries. On January 4, 2021, National General became a wholly owned subsidiary of the Allstate Corporation.

15)     Defendant LIFE Association, Inc. ("LIFE") is a nonprofit corporation incorporated in Texas with its principal place of business in Texas. LIFE is registered as a foreign nonprofit corporation in most of the remaining 49 states. LIFE does not have a 501(c) exempt organization status conferred by the IRS. Through LIFE as the policyholder, National Health sells its Short-Term Policies in 19 states. National Health represents that it issued a group policy to LIFE in Alabama on August 1, 2019. LIFE has a "virtual office" in Alabama with no actual physical presence or employees.

16)     Defendant Joseph Holm is a resident of Maricopa County, Arizona. Holm is a licensed insurance agent in the state of Arizona, license number 261997. He is the sole member of Health Insurance Advocates LLC. Holm sells Short-Term and Accident Policies marketed by National Health, and sold such policies to the Fontaines. At all relevant times herein, Holm was the authorized agent of National Health, as well as the authorized agent of Health Insurance Advocates LLC. The conduct alleged herein was performed in the course and scope of Holm's employment, agency, and/or ostensible agency relationship with National Health and Health Insurance Advocates LLC, rendering the National Health and Health Insurance Advocates jointly, severally, and vicariously liable for Holm's conduct.

17)     Defendant Health Insurance Advocates LLC is a member-managed limited liability company registered in Arizona. Defendant Holm is the sole member of Health Insurance Advocates LLC and conducts his insurance agency business through this LLC.

5

18)     Nonparty Meritain Health ("Meritain") is a third-party claims administrator and a subsidiary of Aetna and CVS. Meritain administered portions of Mr. Fontaine's claims on behalf of National Health, and National General. In all aspects related to the handling of Fontaine's claim, Meritain acted on behalf of National Health.

## FACTUAL ALLEGATIONS

### State Law Causes of Action

#### *The Application*

19)     This action arises from National Health's and National General's fraudulent scheme to deny benefits to their insureds and Defendants' concomitant failure to pay hundreds of thousands of dollars of medical bills Mr. Fontaine incurred after he was seriously injured in a traffic accident. Defendants were obligated to pay such bills under the Short-Term Policy issued to Fontaine.

20)     In a telephone call on December 15, 2020, Defendant Holm completed an application for National Health's Short-Term Policy on behalf of the Fontaines.

21)     Defendant Health Insurance Advocates LLC was acting through Holm at all times and is responsible for Holm's actions and conduct relating to all matters regarding the sale of insurance.

22)     Holm also completed an application for a "National General Accident & Health Accident Medical Expense" policy ("Accident Policy") which he represented would cover the Fontaines' deductible on the Short-Term Policy in the event of an accident.

23)     Holm completed the applications for the Short-Term and Accident Policies by soliciting information from Ms. Fontaine over the phone on December 15, 2020. Holm did not provide the actual applications to Ms. Fontaine or otherwise facilitate Ms. Fontaine being able to see and review the application during this process.

24)     At all times during his interactions with the Fontaines, Holm acted as National Health's actual or apparent agent.

25)     Through a contract with National Health, Holm was an appointed agent for National Health authorized to solicit business on behalf of National Health by obtaining

customers, facilitating the application process, including facilitating the collection of premiums and communicating with applicants and insureds about the details of National Health's insurance products.

26)   National Health and National General refer to agents such as Holm as "business associates of National General Accident & Health."

27)   National Health requires its agents, like Holm, to ensure the applicant is provided with details concerning terms of coverage under National Health's policies, including the Outline of Coverage.

28)   Through National Health's "Retention Department," National partners with its agents such as Holm in order for the agents and National Health to successfully retain existing National Health clients. National Health agrees to take the active role in working to increase the retention of these clients.

29)   National Health supplied Holm with the insurance application and associated software and internet portal that Holm used to provide the Fontaines with National's Short-Term Policy through National General's subsidiary Quotit Corporation.

30)   National Health provided training to Holm on how to sell National Health's products, the content of those products, and tools to sign up customers for its policies.

31)   National Health provided Holm with access to its sales materials and brochures for its Short-Term and other policies.

32)   National Health provides its agents, like Holm, with their own personal quoting links and helps its agents track client contacts through an internet portal created and maintained by Quotit Corporation, National General's subsidiary.

33)   During the December 15, 2020 call with Holm, Ms. Fontaine provided complete and accurate information in response to Holm's questions, including the details of an angiogram that Mr. Fontaine received in 2016. Holm told Ms. Fontaine that the angiogram and associated findings would have no impact on the Fontaines' approval for a Short-Term Policy.

34)     National Health's goal is to maximize the number of Short-Term policies it issues regardless of the medical conditions of applicants and to maximize the number of policies it can rescind if and when insureds submit claims.

35)      National Health's application is deliberately designed to be broad and vague, and does not provide the applicant the ability to explain or provide details about his or her medical history. National Health's purpose is to sow ambiguity and breed opportunities to rescind policies.

36)     Holm failed to include on the Short-Term Policy application relevant portions of the Fontaines' medical history reported to him by Ms. Fontaine, including the 2016 angiogram of Mr. Fontaine. Holm also failed to ask Ms. Fontaine all the questions contained on the written application.

37)     Ms. Fontaine provided, in good faith, all information – and more – that Holm led her to believe was required for the Short-Term Policy application.

38)     All information provided by Ms. Fontaine to Holm in connection with the Short-Term and Accident Policy applications was forthright, accurate, and honest.

39)     Ms. Fontaine informed Holm that she and her husband had been insured the last few years through the ACA and that they had already signed up for new comprehensive medical coverage under an Affordable Care Act policy, to be effective January 1, 2021. Based on Holm's representations that National Health's Short-Term Policy would provide the Fontaines even better, more comprehensive coverage for a lower price than policies available under the Affordable Care Act, including the policy under which the Fontaines were already insured, the Fontaines agreed to replace their ACA compliant policy with the National STLD policy.

40)     In the course of advising Ms. Fontaine about the National Health Short-Term Policy and coverage, Holm deceived, misled, and made false promises regarding certain aspects of the application process, the Fontaines' coverage, and their insurance contract.

41)     In the course of advising Ms. Fontaine about National Health's insurance contract and coverage, Holm misrepresented the scope, quality, and very nature of the coverage provided, including its limitations and exclusions.

42)     For example, though the Short-Term Policy is designed to provide medical coverage on a short-term basis and is not an adequate substitute for comprehensive medical insurance, Holm represented the opposite, leading the Fontaines to believe that it was an adequate and even superior substitute for their existing, ACA-compliant medical insurance.

43)     In addition, Holm deceived and made misrepresentations to the Fontaines by repeatedly referring to the Short-Term Policy as an Aetna policy. Aetna, unlike National Health, is a major, nationwide medical insurer that sells Affordable Care Act polices and has no corporate relationship to National Health or National General. National Health's Short-Term Policy, however, purports to give National Health's insureds access to Aetna's Open Choice PPO Network.

44)     Furthermore, Holm steered the Fontaines away from more comprehensive ACA policies and in favor of National Health's policy by using misinformation and scare tactics.

45)     In the course of completing the Short-Term Policy application on behalf of the Fontaines, Holm misrepresented the Short-Term Policy's exclusions and deceived the Fontaines by failing to ask all of the heath questions on the application and then checking that the Fontaines responded in the application.

46)     For example, Holm checked the "No" box in response to all four "Eligibility Questions" contained on the application, including the question: "Within the last 5 years, has any applicant received medical or surgical treatment, consulted a health care professional, or has medication been prescribed or recommended for the following…. Alcoholism, Alcohol or Chemical Dependency, or Drug or Alcohol Abuse."

47)     If Holm had asked Ms. Fontaine the question about alcohol abuse, she would have answered "Yes" to this question because Mr. Fontaine was treated for alcohol abuse within the reporting period.

9

48)     Based on the questions Holm did ask and the information provided by Ms. Fontaine on December 15, 2020, in response, Holm knew that Mr. Fontaine's medical history rendered him ineligible for coverage according to the language of the application.

49)     In the course of completing the application, Holm repeatedly assured Ms. Fontaine that the Short-Term Policy application would be accepted and none of the information provided by Ms. Fontaine affected her or Mr. Fontaine's eligibility for the Short-Term Policy.

50)     Holm repeatedly informed the Fontaines that they could cancel their existing Affordable Care Act policy, as they would have coverage under the Short-Term Policy.

51)     At no time before Holm's submission of the application did the Fontaines receive a copy of the application or any other document describing the coverage for which they were applying.

52)     Beginning on January 1, 2021, the Fontaines were insured under the Short-Term Policy, policy no. 2010900939. The company name on the Short-Term Policy is "National General Accident and Health."

53)     Also beginning on January 1, 2021, the Fontaines were insured under the Accident Policy, policy no. 2010900941. The company name on the Accident Policy is "National General Accident and Health."

54)     National Health issued coverage to the Fontaines under the Short-Term and Accident Policies without seeking any additional information or clarification regarding the materials and information submitted by Mr. Holm when applying for the policies.

55)     All premiums due under the Short-Term and Accident Policies were paid to National General Accident and Health, and Mr. Fontaine has performed all obligations required of him under the policies.

56)     Based on Holm's representations, the Fontaines canceled their existing Affordable Care Act policy.

***The Accident***

57)     On February 20, 2021, Plaintiff was in a severe motorcycle accident in which he was run over by a large pickup truck.

58)     Mr. Fontaine was taken by air ambulance to the emergency room at Banner Thunderbird Medical Center where he was admitted and treated for multiple fractures, a cerebral hemorrhage, and other injuries.

59)     Mr. Fontaine timely submitted claims on his Short-Term Policy for the medical expenses arising out of his motorcycle accident, including the air ambulance transport.

60)     All medical care related to the accident received pre-approval from National Health.

61)     The Fontaines contacted Holm after the accident regarding irregularities contained in a version of the Fontaines' application downloaded from National Health's online portal, including the application's question about past treatment for alcohol abuse.

62)     Holm consulted with National Health concerning the manner in which the Fontaines' application was completed.

63)     Holm assured the Fontaines that National Health would cover all of Mr. Fontaine's medical expenses resulting from the accident.

64)     The Fontaines did not receive copies of their application or their Short-Term and Accident Policies, all bearing the name National General Accident and Health, until after Mr. Fontaine's accident.

***The Rescission***

65)     In response to Mr. Fontaine's claim, National Health requested, through its agent Meritain, and received Fontaine's medical records dating back to at least 2015 and began a comprehensive investigation of Fontaine's medical history.

66)     The Fontaines repeatedly sent past medical records over a span of almost three months after Meritain claimed it did not receive Mr. Fontaine's medical records.

Meritain's claim it did not receive Fontaine's medical records was merely a delay tactic to give National Health more time to find reasons to deny coverage to Mr. Fontaine.

67)     National Health's claims administrator, Meritain, responded to the Fontaines' inquiries with misrepresentations about whether and when Meritain received Mr. Fontaine's medical records.

68)     National Health denied all Fontaine's claims after making Mr. Fontaine wait almost three months for a definitive answer on whether his claims would be paid. National Health notified Fontaine of its intent to rescind the Short-Term Policy on May 12, 2021, and rescinded the Short-Term Policy on June 14, 2021, dating back to its effective date of January 1, 2021. All correspondence used the name National General Accident and Health.

69)     National Health explained the basis for the claim denial and policy rescission in a letter dated May 12, 2021: according to medical records from 2017 and older, the Short-Term Policy application's eligibility question regarding medical treatment received within the past 5 years should have been answered "Yes" instead of "No" "due to [Fontaine's] medical history regarding alcohol abuse, which would have made [him] ineligible for coverage."

70)     In response, the Fontaines sent a letter addressed to National General Accident and Health on May 21, 2021, contesting the denial and rescission, explaining that when Holm completed the application by phone, he did not inquire about several of the eligibility questions, including with respect to any history of alcohol abuse.

71)     The May 21 letter also explained that the Fontaines had canceled their ACA policy based on the assurances they would be covered by the Short-Term Policy, leaving them without alternative insurance to pay for Fontaine's sizeable and growing medical costs.

72)     The May 21 letter further explained that, upon seeing the submitted Short-Term Policy application available on National Health's internet portal, the Fontaines learned that both the "yes" and "no" boxes were checked in response to the eligibility questions.

73)     Correspondence from National Health, bearing the name National General Accident and Health, dated May 24 and June 14, did not address the content of the Fontaines' May 21 letter, other than to inform them that it would be treated as an appeal and that appeal was ultimately denied because the alcohol-related "question should have been answered 'Yes' due to your medical history regarding alcohol abuse, which would have made you ineligible for coverage."

74)     In its May 24 and June 14 letters to the Fontaines, National Health completely ignored and failed to respond to the Fontaines' allegations about Holm's serious misconduct and the irregularities in the application for the Short-Term Policy.

75)     National Health's rescission of the Short-Term Policy and refusal to pay medical benefits for past, present, and future procedures is contrary to the terms of the Short-Term Policy as well as National Health's duty of good faith and fair dealing, and is part of a corporate plan, scheme, and design by National Health to deny payments rightfully due to insureds under the Short-Term Policy.

76)     Mr. Fontaine's Accident Policy, and Ms. Fontaine's coverage under both the Short-Term and Accident Policies, were not rescinded.

77)     Mr. Fontaine incurred hundreds of thousands of dollars of medical bills.

78)     National Health has acted unreasonably, and continues to act unreasonably, in relying entirely on post-claims underwriting, which National Health uses to deny bargained-for benefits to insureds based upon pre-existing conditions that were purportedly not disclosed to National Health, regardless of whether those pre-existing conditions relate to the insured's injury or medical condition.

79)     National Health engaged in the acts of denying benefits to Mr. Fontaine and rescinding his Short-Term Policy specifically knowing that Fontaine was emotionally vulnerable, and while consciously disregarding a substantial risk of significant harm to Fontaine.

80)     National Health relies on insurance agents to sell its products, and National Health is aware that insurance agents that sell Short-Term Policies routinely engage in deceptive and misleading practices. *See* Shortchanged, *supra*; *see also* the GAO report

13

entitled "Private Health Coverage: Results of Covert Testing for Selected Offerings," available at https://www.gao.gov/assets/gao-20-634r.pdf.

81)   National Health encourages its agents to retain full control over the application process, discouraging applicants from filling out the application themselves.

82)   National Health's agent training materials do not cover in detail, and indeed gloss over, the many limitations of Short-Term Policies as well as the eligibility questions that must be answered in the negative to qualify for a Short-Term Policy.

83)   Agents selling Short-Term Policies can receive up to 10 times the compensation rate that they would receive selling an Affordable Care Act policy. The average commission rate for an agent selling Short-Term Policies is 23 percent, while commissions on ACA policies average two percent, providing an incentive for agents to steer customers away from ACA policies and toward Short-Term Policies. *See* Shortchanged, *supra*; *see also* "Views From the Market: Insurance Brokers' Perspectives on Changes to Individual Health Insurance," at p. 10, available at https://www.urban.org/research/publication/views-market-insurance-brokers-perspectives-changes-individual-health-insurance/view/full_report.

84)   National Health is aware of, or has reason to know of, such deceptive and misleading practices of these agents, but National Health facilitates and fosters such conduct rather than taking any meaningful action to address this unlawful behavior.

85)   National General is aware of and facilitates National Health's unlawful practices by directing and operating various subsidiaries that assist National Health in its bad faith and deceptive practices.

86)   National General owns Velapoint, LLC, which provides marketing support for National Health's products, including support for National Health's website.

87)   National General owns Quotit Corporation, which provides insurance services software and support for National Health's agents and employees.

88)   National General and National Health share the trade name "National General Accident and Health," which is not listed by National General as one of its subsidiaries. National General Accident and Health is the entity listed on National

Health's Short-Term Policies, such as Mr. Fontaine's policy, in its training materials, and in written correspondence with its insureds, including the Fontaines. National General Accident and Health serves as National General's representative for any corporate entity that suits National General's purposes related to the Short-Term Policy.

89)     Meritain's claims administration contract is with National General Management Corporation, a subsidiary of National General.

90)     Through National General Accident and Health, National General was directly involved in Mr. Fontaine's Short-Term Policy and claim for benefits, from the marketing of the Short-Term Policy to the Fontaines to that policy's ultimate rescission.

**RICO Allegations**

*The Regulatory Landscape*

91)     Short-Term Policies were originally intended to fill temporary gaps in health insurance coverage, such as when a consumer is between jobs or needs coverage outside the open enrollment period.

92)     Short-Term Policies exist outside of the Affordable Care Act's numerous consumer protections, most notably the ban on denials or rescissions for pre-existing conditions.

93)     In 2018, federal rulemaking allowed Short-Term Policies to last up to 364 days, with renewability for up to a total of three years.

94)     These temporal limitations, as well as a mandatory notice requirement stating that Short Term Policies are not subject to the Affordable Care Act's protections, are the only federal requirements for Short-Term Policies. The states were free to regulate Short-Term Policies, or not, provided that they at least adhered to these minimal federal requirements.

95)     Arizona treats individual Short-Term Policies similarly to individual disability insurance policies, including subjecting both to requirements such as rate, policy, and form filing, along with the Insurance Director's ability to ensure that

15

premium rates are reasonable in relation to the amount of benefits paid or projected to be paid by a health insurance policy.

96)    Short-Term Policies issued through a group, on the other hand, are treated as group disability insurance policies under the Arizona Insurance Code. Group disability insurance must meet fewer requirements under the Insurance Code, and issuers of such policies do not have to file policies, forms, or rates, depriving the Insurance Director of the ability to ensure rates are reasonable in relation to the premium charged.

97)    For example, group disability insurance policies do not need to comply with the following provisions of the Insurance Code governing individual disability insurance: ARS § 20-1342.02, allowing the Insurance Director to disapprove policy forms if "the benefits provided for in the policy form are unreasonable in relation to the premium charged;" ARS §§ 20-1345 to 1356, requiring the policy to contain specific or similar language upon approval of the Insurance Director regarding contract provisions, such as a grace period, a time limit on defenses, and claim forms, among others; ARS §§ 20-1358 to 1368, requiring specific language if certain optional provisions are included in the policy, such as provisions governing unpaid premiums and cancellation, among others; and ARS §§ 20-1371 and 20-1372, requiring policies issued to Arizona insureds by out-of-state insurers to be at least as favorable to the insured as Arizona's policy requirements and applying Arizona law in the event of a conflict.

98)    National Health classifies its Short-Term Policies, such as the policy sold to the Fontaines, as group policies by virtue of National Health claiming that LIFE Association is the policyholder. In addition to conferring group status on its Short-Term Policy, National Health's use of an out-of-state association, such as LIFE Association, allows it the opportunity to issue its policy in a state with less favorable consumer protection and contract laws, such as Alabama, where Mr. Fontaine's Short-Term Policy was purportedly issued.

99)    For example, Alabama, unlike Arizona, permits an insurer to avoid responsibility for the knowledge of its agents, as well as for the misrepresentations of its agents. *Compare Alfa Life Ins. Corp. v. Reese,* 185 So.3d 1091 (Ala. 2015) *with Stewart*

16

*v. Mutual of Omaha Ins. Co.*, 817 P.2d 44 (Ct. App. Ariz. 1991). Similarly, *compare* Alabama Code 1975, § 27-14-7 (the elements an insurer must prove to establish rescission are read in the disjunctive) *with* A.R.S. § 20-1109 *and Smith v. Republic Nat. Life Ins. Co.,* 483 P.2d 527 (Ariz. 1971) (the elements in Arizona's corresponding statute are to be read in the conjunctive).

100)    National Health's STLD policy issued to the Fontaines states that it was issued to the LIFE Association and delivered to LIFE in the State of Alabama. The STLD policy states that LIFE is the policyholder and that the law of Alabama governs.

101)    National Health has colluded with, and continues to collude with LIFE Association to issue Short-Term Policies through LIFE's group policy in the state of Alabama for National Health to sell the policies to consumers residing in 19 states, including Arizona.

### LIFE Association Is Maintained for the Purpose of Obtaining Insurance

102)    In Arizona, an insurer can offer a group disability policy through an association if the association "is maintained in good faith for purposes other than that of obtaining insurance." ARS § 20-1401(A)(2).

103)    LIFE was originally founded as CBSAA, Inc., in 1990 as a nonprofit corporation in Texas. One of its purposes was to study the "means and methods of providing consumers of America with benefits and services in the most cost-efficient manner and to implement such studies."

104)    CBSAA changed its name to L.I.F.E. Association, Inc. in 2007 and began registering in other states as a foreign nonprofit corporation starting in 2008. For example, LIFE filed with the secretaries of state in California, Florida, North Carolina, and Virginia in 2008; Alabama, Nevada, and Louisiana in 2009; Arizona, Michigan, and Ohio in 2010; and North Dakota in 2011, among other states.

105)    Although it claims a nonprofit status, LIFE does not file with the IRS as a 501(c) organization, and thus does not file an IRS Form 990 outlining its activities to the IRS for public inspection.

106)   LIFE currently has seven directors on its board.

107)   LIFE's website describes its mission as "provid[ing] the best, most up to date information available to EMPOWER Members to make INFORMED choices in the ongoing endeavor of accomplishing each of their goals."

108)   LIFE has various membership levels, one of which is a "Prime" membership, which is the level of membership required of National Health insureds on the LIFE group policy. Membership benefits purportedly include: diagnostic facility negotiations, hospital negotiations, identity theft protection, and telemedicine, among others. There is no mention of National Health's insurance products on LIFE's website.

109)   On information and belief, many of LIFE's purported "benefits" are of little or no value to LIFE members.

110)   To gain access to LIFE's benefits through the online member portal, a member must first register. "To register you will need your Member ID Card that shows your Member ID and Group Number." The Member ID Cards with a Member ID and Group Number are issued by National Health to those who have purchased and have been issued a National Health insurance policy.

111)   When someone signs up for a LIFE membership, they receive an email from America's Health Care Plan, which is a subsidiary of National General.

112)   If a LIFE member wants to cancel the LIFE membership, they must contact "memberservices@nhicadmin.com." NHIC is National Health Insurance Company. LIFE's website also tells members that cancellations can be completed by calling 888-781-0585, which connects the caller to National General Accident and Health, "which markets products underwritten by National Health Insurance Company."

113)   Upon information and belief, after a LIFE member's National Health insurance policy lapses, ends, or is rescinded by National Health, LIFE makes no attempt to retain the formerly-insured member as a dues-paying, non-insured member. LIFE also inflates the number of its non-insured members by holding over insured members whose insurance has ended and continues to charge LIFE's membership fee until cancelled.

114)    A LIFE membership requires that the member consent to a release of medical information.

115)    America's Health Care Plan, a subsidiary of National General, administers LIFE's membership program.

116)    Velapoint LLC, a subsidiary of National General, markets LIFE's memberships.

117)    Substantive discussions in LIFE's membership meeting minutes from 2014 to 2018 deal almost exclusively with insurance and adding to the membership, rather than LIFE's other benefits, or LIFE's goals and mission.

118)    LIFE's 2014 member meeting minutes state that "[r]evenue to the Association began to be affected immediately after the passage of ObamaCare…. The Association staff and Directors are seeking additional programs to promote its mission during these uncertain days while the benefits of the ACA are more clearly defined." At the meeting staff reported LIFE had 3,055 insured members and 1,190 non-insured members.

119)    LIFE's 2015 member meeting minutes note that LIFE had 13,505 insured members and 932 non-insured members. "These membership figures represent a significant increase from 2014, which resulted from the contracting of America's Health Care Plan[] (AHCP) to act as the marketing arm for sales of LIFE memberships. New insured plans have been developed and marketing commenced September, 2013." As noted above, America's Health Care Plan is owned by National General.

120)    LIFE's 2016 member meeting minutes note that LIFE had 36,965 insured members and 18,598 non-insured members. The remainder of the minutes are almost an exact copy of the 2015 minutes, with only the dates changed.

121)    LIFE's 2017 member meeting minutes note that LIFE had 79,335 insured members and 21,670 non-insured members. As in 2016, the remainder of the meeting minutes are almost an exact copy of the previous year's minutes regarding the contracting of America's Health Care Plan.

122)   LIFE's 2018 member meeting minutes note that membership exceeded 100,000 members. The minutes provide no specifics on the number of insured versus non-insured members. "These membership figures represent a significant increase from 2017. New insured plans have been developed and marketing commenced during 2018."

123)   In 2019, in North Carolina alone, LIFE had 9,466 dues-paying members, with 8,435 of those members enrolled as insureds. LIFE's *monthly* income from its North Carolina members was $1,814,859 in insurance premium and $167,312 in member dues. This equates to $21,778,308 in yearly insurance premium and $2,007,744 in yearly member dues.

124)   LIFE is not maintained in good faith for purposes other than that of obtaining insurance, but is solely focused on providing insurance and reaping the accompanying membership dues that member-insureds are required to pay to maintain that insurance.

### National Health's Promotion of and Support for LIFE

125)   National Health advertises and promotes LIFE membership in its marketing materials.

126)   National Health's agent training materials represent that LIFE is an added benefit to insureds, rather than a necessary condition of obtaining National Health's Short-Term Policies in certain states.

127)   National Health's agents do, in fact, portray LIFE to applicants for National Health products as an added benefit or "bonus" rather than a necessary condition of obtaining National Health's policies.

128)   The amount a National Health insured is required to pay for a National Health Short-Term Policy issued through LIFE is shared between National Health and LIFE.

129)   National Health determines the level of LIFE membership an insured will receive based upon the insurance policy an individual purchases.

130)    National Health does not disclose to applicants or insureds why enrolling in a National Health Short-Term Policy requires an insured to become a member of LIFE.

131)    National Health does not disclose to its applicants or insureds National's financial interest in LIFE. Rather, National Health vaguely asserts that "Your agent and National General Accident & Health may receive financial compensation in connection with membership fees."

132)    National Health collects premiums for its Short-Term Policies simultaneously with LIFE membership dues as one lump sum deducted from an insured's bank account.

***National Health's Fraudulent Rescission and Denial Operation***

133)    National Health performs no underwriting investigation to determine an applicant's eligibility. The entirety of National Health's underwriting investigation occurs post-claim.

134)    National Health waits until a claim has been filed to obtain information and make underwriting decisions. In this way National Health maximizes the number of insureds whose premiums they collect, while avoiding the costs of the normal underwriting process. National Health continues to accept premiums from its insureds, such as Mr. Fontaine, knowing that it will later challenge the insured's eligibility for coverage to avoid contract performance.

135)    National Health emphasizes the ease of acquiring coverage and de-emphasizes or ignores the Short-Term Policy's limitations, and conceals its regular pattern and practice of back-end denials to limit its exposure to large claims.

136)    National Health offers "next day effective dates" from the date of application submission.

137)    National Health's agent training materials tell agents the following: "You can place an application today and it will be effective tomorrow."

138)   National Health maximizes the number of applicants who are issued coverage in order to collect premiums while maximizing opportunities for post-claim denials and policy rescissions.

139)   National Health's enrollment form for STLD policies is designed to further National Health's plan. In the "General Information" section of the form there are two sets of "yes" and "no" boxes adjacent to the questions regarding previous major medical health insurance and the use of tobacco, calling for a response by both the primary applicant and his or her spouse.

140)   Before the "Eligibility Questions" there is a note stating: "If you answer 'yes' to any of the questions below coverage cannot be issued." The four questions that follow are:

> (1) Is any applicant now pregnant, an expectant parent, in the process of adopting, in the process of surrogate pregnancy or undergoing infertility treatment?
> (2) Within the last 5 years, has any applicant received medical or surgical treatment, consulted a health care professional, or has medication been prescribed or recommended for the following: [13 categories of health conditions follow]?
> (3) Within the last 5 years, has any applicant received medical or surgical treatment, consulted a health care professional, or has medication been prescribed or recommended for Acquired Immune Deficiency Syndrome (AIDS) or tested positive for Human Immunodeficiency Virus (HIV)?
> (4) In the last 12 months, has any applicant: a) Been recommended or scheduled for testing (excluding routine), treatment, follow-up, or surgery that has not been completed? b) Consulted a health care professional for signs and symptoms of a medical condition for which a diagnosis has not been determined or a final diagnosis has not been communicated or determined?

141)   Adjacent to each of these four questions is a single box for "yes" and a single box for "no." The eligibility questions portion does not contain separate boxes for a response from each applicant, such as both the applicant and the applicant's spouse.

142)   Following the enrollment form questions is an Authorization which applicants are required to sign. The Authorization permits National Health to request and receive an unlimited array of medical information for each applicant and their dependents. National Health states that an applicant must provide the authorization "to facilitate underwriting determinations," "to determine my (our) eligibility for this

22

insurance," and "is required in order to enable National Health Insurance Company to make eligibility determinations." The authorization does not expire until the earlier of 30 days after denial of an application or, if insured, 24 months from the date signed.

143)   National Health does not conduct any pre-issue underwriting investigation beyond a review of an applicant's enrollment application, in addition to ensuring the first premium payment has been received.

144)   National Health has created the conditions for its agents to act as de facto underwriters. Agent commission rates for STLD plans are on average more than 10 times greater than commission rates for ACA-compliant policies. Confronted with the enrollment form warning that coverage will not issue if certain questions are answered "yes," the agent is placed in a conflict of interest between his or her interest in selling a National STLD policy and thereby receiving National Health's generous commissions versus providing accurate and honest advice to applicants and recording the applicants' responses accurately and honestly.

145)   National Health's agents bear the risk of losing a sale, creating a powerful incentive for agents to misrepresent National's policies to applicants and to fraudulently fill out incorrect answers to National Health's eligibility questions.

146)   National Health's agents bear *no* risk, and suffer no penalty, for misrepresenting National Health's eligibility requirements and fraudulently filling out applicants' answers to eligibility questions incorrectly because the agent can simply assert he made a mistake if confronted about filling out application questions incorrectly.

147)   National Health trains its agents in how to complete the enrollment form and to then send an email link to the applicant to read and sign "in a few short minutes."

148)   As noted in Paragraphs 74 and 80-84, National Health knows or has reason to know its agents engage in deception, material misrepresentations, and omissions when selling National Health's Short-Term Policies.

149)   Holm, National Health's agent, acted as a tool of National Health's rescission and denial operation by doing exactly what National Health expected of him: Holm highlighted the purported benefits of the Short-Term Policy while completely

ignoring the risks and limitations and mispresenting the application process to the Fontaines, as noted above.

***National Health and LIFE's Fraudulent Scheme to Deceive Regulators and Insureds***

150)   National Health offers Short-Term Policies exclusively through LIFE in 19 states: Arizona, Nevada, Texas, North Dakota, Arkansas, Louisiana, Mississippi, Tennessee, Kentucky, Illinois, Michigan, Indiana, Ohio, Alabama, Georgia, Florida, South Carolina, North Carolina, and West Virginia. National Health no longer offers Short-Term Policies in Virginia but did so until recently.

151)   National Health's Short-Term Policies in the states listed above were issued as one group policy to LIFE in the state of Alabama.

152)   LIFE applied for a group Short-Term Policy from National on July 30, 2019. The application does not list LIFE's address, but lists the city as Birmingham, Alabama 35209.

153)   National Health issued a group Short-Term Policy to LIFE on August 1, 2019, policy no. L2999999999-01. The Short-Term Policy was "issued in Alabama and, unless otherwise provided in this Policy, is governed by the laws of that state."

154)   LIFE's website lists its Alabama office at 2100 Southbridge Pkwy, Ste 650, Birmingham, AL 35209. This is the same ZIP code listed on LIFE's application to National Health for the group Short-Term Policy. LIFE's website has listed this Alabama address since at least November 26, 2020.

155)   LIFE also represents to its members that it operates out of the Alabama office address in email communications.

156)   LIFE does not have, nor has it ever had, any employees or physical presence in Alabama.

157)   LIFE's Alabama address is a "virtual office suite" where anyone, for a price, can receive mail and have it forwarded, and can have calls forwarded from an Alabama phone number to LIFE's office in Texas. More than 70 businesses claim this location as their address. *See*

24

https://www.davincivirtual.com/loc/us/alabama/birmingham-virtual-offices/facility-4333.



158)    In a June 4, 2019 filing with the Arkansas Department of Insurance, National Health and LIFE represented that LIFE's address was at 2011 Southbridge Parkway, Suite 650, Birmingham, AL 35209. The 2011 address does not exist. 2100 Southbridge Parkway is the address LIFE lists on its website. Using this Alabama address was a misrepresentation to the Arkansas Department of Insurance, as LIFE has no physical presence or employees in Alabama.

159)    In an August 30, 2019 filing with the North Carolina Department of Insurance, National Health and LIFE represented that LIFE's principal business address was at 2011 Southbridge Parkway, Suite 650, Birmingham, AL 35209.  Using this Alabama address was a misrepresentation to the North Carolina Department of Insurance, as LIFE has no physical presence or employees in Alabama.

160)    In an August 14, 2019, filing with the Virginia Department of Insurance, National Health submitted LIFE's group Short Term Policy application, and the group

Short-Term Policy itself, representing that LIFE conducted business in Alabama by using an Alabama ZIP code as LIFE's address. Using this Alabama ZIP code was a misrepresentation to the Virginia Department of Insurance, as LIFE has no physical presence or employees in Alabama.

161)    These state regulatory filings do not have individuals associated with them, but they are found on each state's SERFF database, maintained by the National Association of Insurance Commissioners, where insurance company filings with state regulators are publicly available. Representatives of National and LIFE provided this information to state regulators. In each instance, National Health's and LIFE's representations were intended to deceive state regulators by making them believe LIFE had a legitimate connection to Alabama, when in fact this Alabama connection was fraudulent and existed only to confer group status on National Health's insurance products.

162)    National Health filed lists of exempt forms with the Arizona Department of Insurance in 2019, 2020, and 2021, representing and certifying that none of the forms were deceptive and all forms complied with applicable laws. The list of exempt forms included National Health's Short-Term Policy documents, such as the "STM Association Master Policy," the "STM Association Certificate of Coverage," and the "Short Term Medical Certificate." National Health filed this list of exempt forms with the full knowledge that its forms contained false and misleading information about National Health's issuance of the group Short-Term Policy to LIFE in Alabama. In order to be exempt from filing forms with the Department of Insurance based on group status, National Health must have issued the policy to a legitimate association. ARS § 20-1401(A)(2) requires an association claiming group status to be "organized and [] maintained in good faith for purposes other than that of obtaining insurance…."

163)    On June 27, 2019, National Health employees Kristi Milligan and Sammi-Jo Nevin submitted the false and misleading information referenced in Paragraph 162 to the Arizona Department of Insurance.

164)    On June 27, 2020, National Health employees Beth Schmitz and Sammi-Jo Nevin submitted the false and misleading information referenced in Paragraph 162 to the Arizona Department of Insurance.

165)    On June 21, 2021, National Health employees Beth Schmitz and Sammi-Jo Nevin submitted the false and misleading information referenced in Paragraph 162 to the Arizona Department of Insurance.

166)    In its May 2020 annual report to the Alabama Secretary of State, LIFE did not list any Alabama addresses for its activities, such as its "Reporting Address," "General Business" address, or addresses for its president and secretary.

167)    In its 2020 annual report to the Arizona Corporation Commission, LIFE did not list any Alabama addresses for its activities, but listed a Plano, Texas, address as its "principal office address."

168)    National Health's Short-Term Policy issued to the Fontaines lists "LIFE Association" as the policyholder with a Plano, Texas, address, not an Alabama address.

169)    Through the control of its subsidiaries, National General facilitates the fraudulent scheme with National Health and LIFE, as noted in Paragraphs 85 to 90, by providing supervision, tools, and expertise to solicit and retain insureds, and to review, process, and deny claims. National General also provided support services to LIFE through its subsidiaries, as noted in Paragraphs 111, 112, 115, and 116, by marketing LIFE (Velapoint) and administering LIFE's membership department (America's Health Care Plan).

170)    For example, National General, through National General Accident and Health, collected both National Health's Short-Term Policy insurance premiums and LIFE's membership dues *in the same transaction* from the Fontaines and other insureds.

171)    The relationship between National Health, National General, and LIFE constituted an enterprise formed for the mutual benefit of all parties and at the expense of defrauded consumers like Mr. Fontaine. The relationship between Defendants was not arms-length, but was carefully conducted and orchestrated to effect the enterprise's purposes.

172)   National Health benefitted from the enterprise. First, by attaining group disability insurer status through LIFE, National avoided Arizona's insurance regulations governing individual disability insurance. Among other things, National Health avoided numerous provisions of the Arizona Insurance Code relating to individual disability insurance, avoided the need to file rates and forms for approval with the Arizona Department of Insurance, and avoided regulation of the reasonableness of premiums charged in relation to benefits paid.

173)   For example, National Health's nationwide loss ratio for its STLD Association policies was 39% in 2019, 38.9% in 2020, and 34.6% for a portion of 2021.

174)   A loss ratio means the percentage of every premium dollar that an insurer pays out in benefits for its insureds. The Affordable Care Act mandates loss ratios between 80% and 85%, and if the insurer falls short of these thresholds, it must provide refunds to its insureds.

175)   Arizona's regulation related to individual disability insurance, Arizona Administrative Code R20-6-607, which includes individual Short-Term policies, requires a loss ratio of at least 60%.

176)   National Health knew that it needed to comply with a 60% loss ratio if its policies were characterized as individual disability insurance. For example, in a 2014 filing with the Arizona Department of Insurance, National Health listed a projected loss ratio of 60% for its individual Short-Term policies.

177)   Alabama, where National Health represents that Mr. Fontaine's Short-Term group policy was issued to LIFE, does not require health insurers to meet a minimum loss ratio threshold, and indeed, the Department of Insurance does not have the authority to regulate rates for health insurance at all.

178)   By its fraudulent activity, the enterprise eliminated National Health's need to comply with any loss ratio requirement, allowing National Health to reduce its spending on benefits from 60% of premium dollars to less than 40% of those dollars.

179)    As of December 31, 2019, National Health's Arizona premiums were $29,090,000. A 20-point increase in the loss ratio requirement would have cost National Health almost $6 million, just in Arizona in one year.

180)    Additionally, National Health and its insurance agents receive "financial compensation in connection with membership fees," giving National Health an additional financial incentive to partner in the enterprise with LIFE by receiving a kickback for every single LIFE membership for National Health's insureds.

181)    National Health pads its profits by utilizing its unlawful scheme of agent deception and post-claims underwriting to deny benefits to its insureds as its normal pattern and practice.

182)    National General benefitted from the enterprise by reaping profits from National Health and National General's various subsidiaries that facilitated the fraudulent scheme, such as National General Management Corporation, America's Health Care Plan, Velapoint, and Quotit.

183)    LIFE benefitted from the enterprise by collecting membership dues that would never have been paid to it absent National Health's insurance offerings. Upon information and belief, LIFE could then dole out that income to its directors' friends and associates as contractors, or could provide such funds to pet charities, like LIFE Community Enrichment. *See* https://www.lifecommunityenrichment.org/.

184)    Mr. Fontaine, and thousands of other consumers in Arizona and across the country, were victims of the enterprise's fraudulent scheme.

185)    National Health, National General, and LIFE's enterprise allowed National Health to reduce its prices for STLD policies to be more competitive against comprehensive health coverage offered by Affordable Care Act plans.

186)    By passing its Short-Term Policies off as group disability policies instead of individual disability policies, National Health reduced its exposure to costly regulations, most notably in that its rates did not need to be reasonable as judged by the Arizona Department of Insurance.

187)   The Fontaines had purchased Affordable Care Act policies for several years, and had already signed up for an Ambetter ACA-compliant policy for 2021, when the fraudulently cost-competitive nature of National Health's product, along with National Health's misrepresentations and material omissions about coverage and eligibility, combined to cause the Fontaines to cancel their comprehensive Ambetter insurance policy.

188)   As a direct result of the fraudulently rigged and artificially competitive cost of National Health's Short-Term Policy and National's denial and rescission operation, Mr. Fontaine suffered hundreds of thousands of dollars in medical expenses that would have been covered by an ACA policy without question due to the low out-of-pocket maximums mandated by the ACA. Mr. Fontaine also paid premiums for the Short-Term Policy that he would not have otherwise paid. Finally, Fontaine paid LIFE's membership fee that he would not have otherwise paid.

***Enterprise***

189)   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

190)   Based on Mr. Fontaine's current knowledge, the following persons constitute a group of individuals associated in fact as an enterprise: National Health, National General, Holm, and LIFE.

191)   The enterprise constitutes an ongoing organization and continuing unit perpetuating the fraudulent scheme as National Health continues to offer Short-Term Policies in Arizona exclusively through LIFE, and National Health continues to file representations to state Insurance Departments that Alabama law applies to its policies, continuing the façade that LIFE has a legitimate connection to Alabama and is a legitimate association for group policy status within the meaning of the law.

192)   National General participated in the enterprise as a co-schemer by providing National Health and LIFE with the support and tools needed to carry out the fraudulent scheme and with full knowledge of the scheme's aim to defraud state regulators and National Health insureds.

193)    Holm participated in the enterprise by following National Health's unwritten playbook to misrepresent the Short-Term Policy to applicants like the Fontaines and to check "no" on the application to ensure eligibility despite the applicant's answers to the eligibility questions.

194)    National General subsidiaries Velapoint, Quotit, America's Health Care Plan, and National General Management Corporation participated in the enterprise, as noted in the following Paragraphs: 86, 116, 169, 182 (Velapoint); 29, 32, 87, 182 (Quotit); 111, 115, 119, 121, 169, 182 (America's Health Care Plan); and 89, 182 (National General Management Corporation).

195)    While Defendants participate in and are members of the enterprise for the common purpose of getting a cut of insureds' hard-earned dollars, they also have an existence separate and distinct from the enterprise.

196)    National Health and National General needed LIFE to facilitate the fraudulent avoidance of state insurance regulations, while LIFE used National Health and National General to increase membership, and thus member dues, to increase revenues to dole out to associates and to fund pet projects.

***Predicate Acts***

197)    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1343 (relating to wire fraud). Defendants have engaged, and continue to engage, in conduct violating this law to effectuate their scheme.

198)    For the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire or caused to be transmitted and received by wire, matter and things which include but are not limited to the misrepresentations and omissions made to state insurance departments. Wire transmissions were also used for the distribution of information to and collection of information from consumers, including Mr. Fontaine, for application purposes and for the collection of LIFE's membership fees and National Health's premiums.

199)   National Health's scheme to avoid the protections of Arizona's insurance laws, and to preplan rescinding a high volume of policies, could not have been carried out without National Health, National General, and LIFE engaging in wire fraud, including in the form of electronic communications misrepresenting the true nature of LIFE, of National's relationship to LIFE, and LIFE's primary business location.

200)   National Health could not have conducted its preplanned scheme to rescind its insureds' policies, including Mr. Fontaine's, without its act of electronically sending agents and insureds National Health's authorization form that National Health would use to obtain an insured's medical records during National Health's post-claim underwriting investigation, and without instructing that the signed form must be electronically returned to National Health to obtain insureds' medical records.

201)   In furtherance of the scheme to maximize sales of its Short-Term policies by conducting no medical underwriting investigation before a policy is issued, and instead to conduct only post-claim underwriting investigations in order to avoid paying claims through denials for pre-existing conditions and policy rescissions, National Health made false and misleading statements and omissions in the authorization form it required all insureds to sign.

202)   National Health did not disclose to applicants that it would conduct no eligibility medical underwriting investigation and that it would automatically conduct a post-claim underwriting investigation in the event of a claim of any significance. Instead, National Health misrepresented that the applicants' signed authorization was necessary to determine the applicants' eligibility for insurance and that if the applicant "refuse[s] to sign or revoke[s] this authorization, [the applicant's] enrollment form may not be processed."

203)   The misrepresentations, acts of concealment and failures to disclose of Defendants were knowing and intentional, and made for the purpose of deceiving state insurance departments, Mr. Fontaine, and other insureds, and obtaining their property for Defendants' gain.

204) Defendants were not only aware of the fraudulent scheme but were instrumental to the functioning of the scheme, as described above.

205) Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and state insurance departments, Mr. Fontaine, and other insureds relied on the misrepresentations and omissions as set forth above.

206) As a result, Defendants have obtained money and property belonging to Mr. Fontaine and other insureds, and Fontaine has been injured in his business or property by Defendants' overt acts of wire fraud.

***Pattern of Racketeering Activity***

207) Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. § 1343 as described above, within the past ten years.

208) Defendants committed at least two acts of racketeering activity in their misrepresentations to state insurance departments between 2019 and 2021, and continued misrepresentations to state insurance departments, that LIFE was legitimately issued a policy in Alabama, and that this qualifies National's Short-Term Policies as group policies. Defendants have also repeatedly made misrepresentations to and deceived insureds, like Mr. Fontaine, about the nature and content of documents signed by insureds, such as the medical release.

209) Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Mr. Fontaine.

210) Defendants have a longstanding business relationship going back to at least 2014.

211) The multiple acts of racketeering activity that Defendants committed and/or conspired to commit were related to each other and amount to and pose a threat of

continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

***Proximate Cause***

212)   Mr. Fontaine's harm was proximately caused by the enterprise's pattern of racketeering activity. National Health actively concealed the cost and risk of purchasing the Short-Term Policy to sell more policies to unsuspecting persons and thereby increase revenue, and Fontaine would not have surrendered his ACA-compliant policy and purchased National Health's product but for the deception.

213)   In addition, National Health's fraudulent scheme incentivizing its agents to misrepresent insureds' answers to application questions on the front end and the preplanned post-claims underwriting and rescissions on the back end of a large claim, such as Mr. Fontaine's, proximately caused Mr. Fontaine to incur staggering medical expenses he would not otherwise have incurred.

214)   Mr. Fontaine's harm was foreseeable as a significant number of National Health's insureds would incur substantial claims and would be personally responsible for such costs after National Health's post-claims underwriting operation led to a rescission. The enterprise's scheme worked exactly as intended by shielding National Health from expensive claims.

215)   The enterprise controlled every aspect of Mr. Fontaine's experience and the factors affecting that experience, from National Health's initial deception of the Fontaines and state insurance regulators, to the rescission of Mr. Fontaine's Short-Term Policy.

216)   Absent National Health's scheme to breed opportunities for post-claims underwriting and policy rescissions and National Health's artificially competitive price of the Short-Term Policy, the Fontaines would have retained the Affordable Care Act policy *they had already secured*. That policy would have limited Mr. Fontaine's medical bills to an out-of-pocket maximum of around $10,000. Nor would the Fontaines have paid premiums to National Health or membership dues to LIFE.

*Concrete Financial Loss*

217)   Mr. Fontaine is a "person" within the meaning of 18 U.S.C. § 1961(3).

218)   Mr. Fontaine suffered a concrete financial loss to his business or property by incurring more than $600,000 in medical expenses related to the traffic accident that would have been covered had Mr. Fontaine not forfeited his Affordable Care Act policy.

219)   Mr. Fontaine also suffered a concrete financial loss by paying for National Health's Short-Term Policy premiums from which he derived no benefit, other than a false sense of security, in the amount of approximately $467 per month for January through June of 2021, equating to approximately $2,800. Although National Health refunded $2,808 to Mr. Fontaine via direct deposit, which Fontaine had no opportunity to refuse, National Health did not pay Fontaine interest on that amount as part of the refund.

220)   Mr. Fontaine also suffered a concrete financial loss by paying for LIFE's membership fees as a condition of obtaining the Short-Term Policy, in the amount of a $35 one-time fee plus a $15 per month membership fee for January through June of 2021, equating to approximately $125.

*Conspiracy*

221)   Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity comprised of numerous acts of wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

222)   Mr. Fontaine was injured by Defendants' overt predicate acts of racketeering in furtherance of the conspiracy.

**COUNT I: VIOLATION OF RICO 18 U.S.C § 1962(C) AGAINST DEFENDANTS NATIONAL HEALTH, NATIONAL GENERAL, AND LIFE ASSOCIATION**

223)   Plaintiff incorporates each and every paragraph alleged above, as though fully set forth herein.

224)   This claim for relief arises under 18 U.S.C § 1964(c).

35

225)   Defendants have conducted or participated in conducting an enterprise through a pattern of racketeering activity.

226)   As a direct and proximate result, Mr. Fontaine has been injured in his business and property by the predicate acts constituting the pattern of racketeering activity. Specifically, Mr. Fontaine has been injured in his business and property by incurring more than $600,000 in unreimbursed medical expenses that would have been covered by comprehensive medical insurance absent Defendants' illegal conduct. Mr. Fontaine has also been injured in his business and property by paying National Health's premiums and LIFE membership fees he would not have paid absent Defendants' illegal conduct.

227)   Accordingly, Defendants are liable to Mr. Fontaine for three times his actual damages as proven at trial, plus interest and attorney's fees.

**COUNT II: VIOLATION OF RICO, 18 U.S.C § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) AGAINST DEFENDANTS NATIONAL HEALTH, NATIONAL GENERAL, AND LIFE ASSOCIATION**

228)   Plaintiff incorporates each and every paragraph alleged above, as though fully set forth herein.

229)   This claim for relief arises under 18 U.S.C § 1964(c).

230)   In violation of 18 U.S.C § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of an enterprise through a pattern of racketeering.

231)   As a direct and proximate result, Mr. Fontaine has been injured in his business and property by the predicate acts constituting the pattern of racketeering. Specifically, Fontaine has been injured in his business and property by incurring more than $600,000 in unreimbursed medical expenses that would have been covered by comprehensive medical insurance absent Defendants' illegal conduct. Fontaine has also been injured in his business and property by paying National Health's premiums and LIFE membership fees he would not have paid absent Defendants' illegal conduct.

232)   Accordingly, Defendants are liable to Mr. Fontaine for three times his actual damages as proven at trial, plus interest and attorney's fees.

### COUNT III: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING BY  DEFENDANTS NATIONAL HEALTH AND NATIONAL GENERAL

233)   Plaintiff incorporates each and every paragraph alleged above, as though fully set forth herein.

234)   Defendants have breached their duty of good faith and fair dealing owed to Mr. Fontaine by their intentional and unreasonable conduct and conscious disregard of Fontaine's rights, in the following respects:

A.   Improperly terminating Fontaine's coverage and violating policy terms and prior representations;

B.   Improperly terminating Fontaine's benefits and violating policy terms and prior representations;

C.   Failing to make adequate benefit payments to Fontaine at a time when Defendant knew Fontaine was entitled to said benefits under the terms of the Short-Term Policy;

D.   Withholding and delaying payment from Fontaine while knowing his claims for benefits under the Short-Term Policy were valid;

E.   Improperly choosing to underwrite Fontaine's policy after his claim was made;

F.   Improperly underwriting the risk after the claim was presented rather than prior to accepting the risk, all contrary to Fontaine's reasonable expectations;

G.   Wrongfully rescinding the insurance contract;

H.   Making misrepresentations in response to the Fontaines' inquiries;

I.   Unreasonably delaying consideration of Mr. Fontaine's claim in order to find reasons to deny coverage;

J.   In all aspects of investigating Mr. Fontaine's claims for benefits

and the facts leading to the rescission of Fontaine's policy, National failed to give Fontaine's interests at least as much consideration as its own and instead elevated its interests above those of Fontaine;

K.   Failing to conduct a reasonably prompt and thorough investigation of facts pertinent to the claim; and

L.   Plaintiffs are informed and believe and therefore allege that Defendant has breached its duty of good faith and fair dealing by other acts or omissions of which Fontaine is presently unaware.

235)   As a result of Defendants' wrongful conduct, Mr. Fontaine has suffered damages under the insurance policy for a total amount to be shown at trial.

236)   As a further result of Defendants' wrongful conduct, Mr. Fontaine has suffered anxiety, worry, fear, humiliation, anger, mental and emotional distress, all to his general damage in an amount to be shown at trial.

237)   Defendants either intended to cause injury to Mr. Fontaine or acted to serve their own interests having reason to know and consciously disregarding the substantial risk that their conduct might significantly injure the rights of Fontaine and others.

## COUNT IV: VIOLATION OF THE INSURANCE FRAUD STATUTE, ARS § 20-443 AGAINST DEFENDANTS NATIONAL HEALTH, NATIONAL GENERAL, JOSEPH HOLM, AND HEALTH INSURANCE ADVOCATES LLC

238)   Plaintiff incorporates each and every paragraph alleged above, as though fully set forth herein.

239)   Defendants have breached A.R.S. § 20-443 of the Arizona Insurance Code.

240)   Defendants have made or caused to be made statements and misrepresentations regarding the terms and benefits of the insurance policy and misrepresentations for the purpose of inducing the Fontaines to forfeit or surrender other insurance coverage.

241)   As a result of Defendants' wrongful conduct, Mr. Fontaine has suffered damages under the insurance policy for a total amount to be shown at trial.

242)     As a further result of Defendants' wrongful conduct, Mr. Fontaine has suffered anxiety, worry, fear, humiliation, anger, mental and emotional distress, all to his general damage in an amount to be shown at trial.

243)     Defendants either intended to cause injury to Mr. Fontaine or acted to serve their own interests having reason to know and consciously disregarding the substantial risk that their conduct might significantly injure the rights of Fontaine and others.

## COUNT V: VIOLATION OF THE CONSUMER FRAUD ACT, ARS § 44-1522 AGAINST DEFENDANTS NATIONAL HEALTH, NATIONAL GENERAL, JOSEPH HOLM, AND HEALTH INSURANCE ADVOCATES LLC

244)     Plaintiff incorporates each and every paragraph alleged above, as though fully set forth herein.

245)     Defendants have breached ARS § 44-1522 of the Arizona Trade and Commerce Code.

246)     Defendants used deception and made misrepresentations to Mr. Fontaine about the extent of coverage provided by the Short-Term Policy. Defendants also deceived Fontaine about the pre-existing conditions that would exclude him from coverage by Defendants' Short-Term Policy. Furthermore, Defendants made false promises to Fontaine that his application for the Short-Term Policy was complete and his coverage was "good to go."

247)     Defendants' deception, misrepresentations, and false promises were made in connection with the sale of merchandise, namely the Short-Term Policy.

248)     Mr. Fontaine suffered damages as a result of reliance on Defendants' deception, misrepresentations, and false promises. Specifically, Mr. Fontaine has suffered damages by incurring unreimbursed medical expenses, in an amount to be proven at trial, that would have been covered by comprehensive medical insurance absent Defendants' deception. Mr. Fontaine has also suffered damages by paying premiums and LIFE Association membership fees he would not have paid absent Defendants' deception.

249)   As a further result of Defendants' wrongful conduct, Mr. Fontaine has suffered anxiety, worry, fear, humiliation, anger, mental and emotional distress, all to his general damage in an amount to be shown at trial.

250)   Defendants either intended to cause injury to Mr. Fontaine or acted to serve their own interests having reason to know and consciously disregarding the substantial risk that their conduct might significantly injure the rights of Fontaine and others.

## COUNT VI: INSURANCE AGENT NEGLIGENCE AGAINST DEFENDANTS JOSEPH HOLM AND HEALTH INSURANCE ADVOCATES LLC

251)   Plaintiff alleges each and every paragraph alleged above, as though fully set forth herein.

252)   Holm undertook responsibilities and obligations when he advised the Fontaines about National Health's insurance products, filled out their application, and submitted the application to National Health.

253)   Holm and Health Insurance Advocates acted in concert, and each as the agent of the other, in providing advice to Fontaine regarding the purchase of health insurance, in filling out the application for Fontaine, and in selling Fontaine the Short-Term Policy with National Health.

254)   Holm and Health Insurance Advocates owed Fontaine the duty to act with reasonable care, skill, and diligence when performing the functions of an insurance agent, and Holm and Health Insurance Advocates were each responsible for the acts of the other.

255)   In the course of advising Fontaine about National Health's Short-Term policy and application process, Holm breached his duty to make adequate disclosure to Fontaine regarding certain aspects of the application process, the insurance contract, and the limitations of the Short-Term Policy.

256)   Holm breached his duty to inform Fontaine of, and to otherwise protect Fontaine from, the exposure and risk of pre-existing condition exclusions.

257)   As a result of Holm's and Health Insurance Advocates' wrongful conduct, Fontaine has suffered damages under the insurance policy for a total amount to be shown at trial.

258)   As a further result of Holm's and Health Insurance Advocates' wrongful conduct, Fontaine has suffered anxiety, worry, fear, humiliation, anger, mental and emotional distress, as well as physical injury and harm all to his general damage in an amount to be shown at trial.

WHEREFORE, Plaintiff respectfully requests that the Court:

    A.    Treble the amount of damages suffered by Plaintiff as proven at trial, plus interest and attorneys' fees and expenses pursuant to RICO;

    B.    Award damages to Plaintiff for Defendants' failure to provide proper benefits and coverage under Plaintiff's medical insurance coverage in a sum to be determined at trial;

    C.    Award damages to Plaintiff for Defendants' deception, misrepresentations, and false promises, in violation of ARS §§ 20-443 and 44-1522, in a sum to be determined at trial;

    D.    Award damages to Plaintiff for Defendants' negligence as Plaintiff's insurance agent in a sum to be determined at trial;

    E.    Award compensatory damages for Plaintiff's mental and emotional distress and anxiety, loss of insurance coverage, and other incidental damages, in an amount to be determined at trial;

    F.    Assess punitive and exemplary damages in an amount appropriate to punish and deter Defendants and similarly situated defendants from engaging in similar conduct in the future, commensurate with the reprehensibility of Defendants' conduct, as provided by law;

    G.    Award Plaintiff the costs of this suit and reasonable attorneys' fees pursuant to A.R.S. § 12-341.01; and

H.     Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED this 23rd day of December, 2021.

*/s/ Steven C. Dawson*

DAWSON & ROSENTHAL, PC
Steven C. Dawson
Anita Rosenthal
Aaron Dawson
Sander R. Dawson
25 Schnebly Hill Road
Sedona, Arizona 86336

David S. Shughart
Beale, Micheaels, Slack & Shughart, P.C.
7012 North 18th Street
Phoenix, Arizona 85020

*Attorneys for Plaintiff*